**Affirmed and Memorandum Opinion filed June 25, 2024.**



In The

# Fourteenth Court of Appeals

## NO. 14-23-00974-CV

## IN THE INTEREST OF M.F.M., A CHILD

**On Appeal from the 310th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2022-54474**

## M E M O R A N D U M   O P I N I O N

The trial court terminated a mother's and father's parental rights to their son, M.F.M. ("Mike"),[1] on predicate grounds of endangering environment, endangering conduct, and failure to comply with a family service plan. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). The court also found that termination was in Mike's best interest and appointed the Department of Family and Protective Services (the "Department") as Mike's sole managing conservator. On appeal, the parents challenge the legal and factual sufficiency of the evidence to support the predicate

---

[1] All of the names used for the children mentioned in this opinion are pseudonyms. *See* Tex. R. App. P. 9.8.

grounds, as well as the best-interest finding and the appointment of the Department as Mike's managing conservator. Because we conclude that legally and factually sufficient evidence supports the trial court's challenged findings, we affirm the judgment.

## Background

Mike was born on August 26, 2022. On August 27, the Department received a referral alleging Mother's neglectful supervision. Mike's four older siblings were in the Department's temporary conservatorship already. On August 29, Mike was taken into the Department's care. On August 30, the Department filed a petition to terminate the parental rights of Mike's parents ("Mother" and "Father").

The Department attached an affidavit from Kimberlyn Thompson, who testified that "there is an immediate danger to [Mike] should he be released into the care of [Mother] and [Father]." According to Thompson, Mike's siblings—five-year-old Angela, four-year-old Nicole, two-year-old Ace, and ten-month-old Samantha—were removed from Mother and Father in January 2022 and placed into the Department's temporary conservatorship. The January 2022 removal occurred because Angela sustained life-threatening injuries and Mother's explanation for the injuries was "suspicious and inconsistent with the findings provided by the medical team." At the time of the siblings' removal, it was unclear who caused Angela's injuries, but "additional outcries" were made by the siblings while in foster placements. Because Mike was at a vulnerable age and would not be able to protect himself from his parents' behavior, the Department sought appointment as temporary managing conservator.

The trial court ordered the parents and the Department to mediation. The parties entered into a mediated settlement agreement ("MSA"), pursuant to which the Department was named Mike's temporary managing conservator.

2

At the trial on the Department's petition, the following evidence was presented.

Houston Police Department Detective Luke Littler investigated the allegation of physical abuse suffered by Angela. In January 2022, Angela was admitted to the hospital with abdominal injuries requiring emergency surgery. The medical team told Detective Littler that "their initial story from Mom was not consistent to that type of injury nor to the severity of it." Detective Littler spoke with Mother, who said that Angela had been injured while playing with her sister in the living room. Angela was on a swivel chair and fell off, and, as she fell, she hit her side on the chair arm, allegedly sustaining the abdominal injuries. Mother heard a loud noise, went into the room, and observed Angela on the ground with the chair on top of her, in pain. Angela vomited at the time.

Mother also told Detective Littler about a burn on Angela's hand, allegedly sustained approximately ten days prior while washing her hands at a Mexican restaurant; "[i]t was assumed that [Angela's sister] put the water on too hot." Mother told Angela's pediatrician about the burn. The pediatrician's records indicated that the doctor did not find that the burn was consistent with abuse.

Detective Littler then met Father at the family's home. Father is Angela's stepfather. Father stated that the injury occurred in the kitchen, not the living room, and he showed the officer "a metal chair in the kitchen to where he said [Angela] had fallen off of." According to Father, Angela and her sister were playing in the kitchen, "jumping from chair to chair, kind of like a merry-go-round, and when [Angela] got to that specific chair . . . she had slipped through and fell in and that the chair had folded up on her." Detective Littler testified, "at this point there's two separate locations of two separate chairs of where [Angela] was said to be hurt." That was significant in his opinion because, "if there's two timelines,

two different stories, and two different mechanisms of injury, either someone is being deceptive or they both are." Detective Littler did not find a swivel chair in the home.

Later, Father told Detective Littler that Angela may have sustained her abdominal injuries earlier in the week when she slipped and fell in the bathroom, hitting her side against the tub. Again, the inconsistent stories indicated to the officer "a level of deception." Detective Littler testified that "none whatsoever" of the explanations given by the parents matched the injuries suffered by Angela.

CPS arrived at the home to remove the remaining children. The Harris County District Attorney's Office proceeded to charge Mother with injury to a child, stemming from Angela's abdominal injuries. Detective Littler testified that the investigation into the burn on Angela's hand was "ongoing." At the time of the January 2022 removal of Angela's siblings, Detective Littler believed the removed siblings were healthy and "well taken care of." Mother's criminal charge had not been resolved by the time of the present trial.

During Detective Littler's investigation into Angela's injuries, he received Angela's medical reports, which described "non-accidental trauma." During Angela's initial forensic interview, she did not disclose anything related to her injuries and was "very hesitant." However, Detective Littler interviewed her foster parents, who relayed Angela's description of how she was injured.

Detective Littler testified that, based on his investigation and the injuries sustained by Angela, "it's likely that those types of injuries and those circumstances could be applied to any child in the household."

Dr. Ashley Gibson, a child abuse pediatrician, testified as an expert in findings of child maltreatment. Dr. Gibson attended to Angela while the child was

4

in the pediatric ICU following surgery. Angela had multiple bruises on her abdomen, two separate perforations through the wall of the small intestine, and a separate injury to the transverse colon of the large intestine where the outer layer of the large intestine was sheared off. These injuries were caused by "significant blunt force trauma." If Angela had not received emergency surgical intervention, she would have died.

Mother gave Dr. Gibson the same explanation for Angela's injuries—falling off of the swivel chair. Dr. Gibson testified that Angela's injuries did not "line up" with Mother's explanation; "there wasn't anything in the history that explained . . . her significant injuries." Dr. Gibson testified that the surgeon noted in his report that Angela's injuries were not explained by a fall from the chair and that "it was more consistent with a punch or a strike." In Dr. Gibson's opinion, Angela's multiple injuries would not have occurred from a single fall. Dr. Gibson also ruled out "horseplay" as a cause of the injuries. At one point, Dr. Gibson testified that she did not have concerns about the other children in the home in January 2022, but later she testified that, "in a home where one child is physically abused," no child is safe in that home. Dr. Gibson agreed that a child born after the abuse would not be safe in such a home; "the person who caused the physical abuse would still be there, and so the risk is still there." Dr. Gibson was "confident[]" that Angela was physically abused, and she testified that a home inhabited by Mother and Father would be an endangering environment for a new baby.

Department Investigator Kelly North testified that Mother told him Angela had fallen from a swivel chair and that Father said Angela hurt her stomach "earlier in the week" by falling against the side of the bathtub. Father also said that, the night before Angela was admitted to the hospital, she and her sister were chasing each other around the dining table and Angela "hit her stomach on the

5

folding chair." As with Detective Littler, Investigator North found the inconsistent stories significant: "[Mother and Father] were both at the same location. They both described the incident occurring at approximately the same time, but it was two completely different stories." Mother and Father also gave conflicting reports about when Mother took Angela to the emergency room.

Department Investigator Danitra Fields-Frazier determined that Mother's explanation for Angela's injuries was not "viable." Investigator Fields-Frazier staffed the matter with her program director, and "it was determined, for the safety of [Angela] and the other children in the home, because [the Department] could not determine who injured the child, it was safe to remove all of the children from the home."

Investigator Fields-Frazier spoke with Angela's pediatrician about the burn on her hand. The pediatrician gave Investigator Fields-Frazier "a different story" than the one given by Mother. Investigator Fields-Frazier learned information during her investigation that led her to believe that the burn was a result of physical abuse.

When Investigator Fields-Frazier spoke with Angela in the hospital, post-surgery, Angela initially seemed happy but once the investigator asked about her injuries, Angela immediately frowned and "shut down." Investigator Fields-Frazier drew a picture of Mother and Father and asked Angela "to point to the person that hurt her." Angela pointed to Father. During the pendency of this case, Investigator Fields-Frazier made a specific request "for no visitation between [Angela] and her mother."

Erika Arguelles with Child Advocates visited Angela while in foster placement. Angela drew a picture of Mother, Father, and her three siblings. Arguelles asked "if there was anyone that she was afraid of in her current

6

placement or anywhere else, and she shook her head yes." Angela then pointed to the drawing, "indicating Mother and [Father]." When asked why, Angela "pointed to her stomach." Arguelles asked what had happened, and Angela "closed up her fist and repeatedly hit her -- her stomach area." Angela additionally told Arguelles that Father had burned her hand. Arguelles also spoke with Angela's sister, Nicole. Arguelles asked what happened when she misbehaved, and Nicole responded, "they don't hit me." Nicole said "they" hit Angela. Nicole clarified to Arguelles that "they" meant Mother and Father. On another occasion, Nicole said that Mother "hit" Angela and Father "burned" Angela. In Arguelles's opinion, witnessing the abuse of another child constitutes child abuse. Arguelles testified that, during the course of this case, Angela was not allowed to meet with Mother.

Arguelles testified that the "sole reason" Mike came into the Department's custody was because of the open CPS case with his siblings.

Angela's and Nicole's current foster mother testified that both Nicole and Angela said that Mother had "hit [Angela] in the tummy." Angela said that Father had burned her hand under scalding water. The current foster mother testified that, "in the last year and half," she had heard "about 60 outcries" from Angela and Nicole," and "all of them have been the same facts, the same situation." The current foster father testified to Angela's verbalized fear of Mother.

Angela's and Nicole's former foster father testified that the girls told him that their home, where they lived with Mother and Father, "was dirty" and "bugs were in everything . . . on their plates, in their bed and in their clothes." Angela and Nicole said that they were left by themselves during the day and that they would walk to a playground. Angela also said that Mother had pulled her hair, resulting in a bald spot on the back of her head about the size of a silver dollar.

7

Daisy Vidal was the CPS caseworker for Mike. Vidal agreed that, by virtue of the MSA, Mother and Father "agreed that there was a continuing danger if [Mike] were to have been returned to their home." Both Mother and Father received family plans of service. Mother and Father completed their services, but Vidal nonetheless testified that the Department did not consider the parents to be in substantial compliance. Vidal explained that, while Mother and Father engaged in individual therapy, neither parent would address Angela's abuse and would not identify why the children came into care.

The Department made a disposition of "reason to believe" abuse in Mike's case, even though he was not born at the time of Angela's January 2022 injuries, "due to the possible risk of endangerment." Vidal testified that an environment where one child is abused is not safe because the parents were not able to protect the children; and if a parent is unwilling to acknowledge that abuse, no child is safe in the environment. Vidal also agreed that, if a parent is in a relationship with someone who committed abuse against a child, that is not a safe environment and, if a parent is unwilling to identify an abuser of the child, that is not a safe environment.

Vidal testified that Mike was in a foster home with his biological sibling, Samantha, with whom he is bonded. Mike and Samantha regularly meet with their other siblings. The foster parents of all the removed children are committed to ensuring the siblings maintain a close relationship. The foster placement is willing to adopt both Mike and Samantha.[2] Vidal explained the Department's reason for seeking termination of Mother's and Father's parental rights to Mike:

---

[2] At the time of trial, Mother's and Father's parental rights to Samantha had been terminated. *See In re A.C.*, No. 14-23-00577-CV, 2024 WL 440263, at *1 (Tex. App.—Houston [14th Dist.] Feb. 6, 2024, no pet. h.) (mem. op.) (affirming termination of Mother's parental rights to Angela, Nicole, Ace, and Samantha and Father's parental rights to Samantha). The

There continues to be an ongoing danger as well as safety concerns in the home and the protective capabilities of the parents as well as an ongoing criminal case. And Baby M is the youngest child. He is 14 months and he is the most vulnerable and unable to express himself or articulate anything if he were to be placed in that home. . . . It puts him at a risk . . . [o]f physical abuse.

Vidal testified that, although Mother was identified as the perpetrator of the abuse causing Angela's abdominal injuries, the Department also had concerns about Father's "protective capabilities." Father continued to reside with Mother; if Father had ceased living with Mother, Vidal testified that "it could have been a possibility" to place Mike with Father.

Vidal also testified that the Department thought it "deceptive" that neither parent could name the Mexican restaurant where they claimed Angela burned her hand under running water. Further, given Angela's accusation that Father burned her hand, the Department "would not" consider returning Mike to Father.

Father testified and denied burning Angela's hand. He testified that he is employed and able to provide financially, physically, and emotionally for Mike. When asked if he would follow a hypothetical court order enjoining him from being around Mother, Father said, "I would follow the orders, but -- I mean, we haven't done anything." Father said that he believed Detective Littler, Investigator North, Investigator Fields-Frazier, Vidal, Angela, and Nicole had lied; "[e]verybody but [Father] and [Mother] have lied."

---

Department moved to amend its petition regarding Mike to add a predicate ground for termination under subsection (M), which provides for termination if a parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." Tex. Fam. Code § 161.001(b)(1)(M). The trial court denied the Department's motion to amend.

At the conclusion of trial, the court found clear and convincing evidence that: Mother and Father knowingly placed or knowingly allowed Mike to remain in conditions or surroundings that endanger the physical or emotional well-being of the child; Mother and Father engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; and Mother and Father did not comply with the provisions of their respective court-ordered service plans. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). The court further found that termination of Mother's and Father's parental rights was in Mike's best interest and that the Department should be appointed Mike's sole managing conservator. *See id.* § 161.001(b)(2). Based on these findings, the court signed a final order terminating Mother's and Father's parental rights to Mike.

Mother and Father appealed.

**Analysis**

Mother and Father filed separate briefs but present the same issues for review: (1) whether the evidence is legally and factually insufficient to support termination under subsections (D), (E), and (O); (2) whether the evidence is legally and factually insufficient to support a finding that termination is in Mike's best interest; and (3) whether the trial court abused its discretion by appointing the Department Mike's sole managing conservator.

**A. Standards of Review**

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection

10

(2). Tex. Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful

of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Predicate Ground

In their first three issues, Mother and Father argue that the evidence is legally and factually insufficient to support termination under the predicate grounds on which the court relied, namely subsections 161.001(b)(1)(D), (E), and (O). To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best-interest finding—even if the trial court based the termination on more than one ground. *In re N.G.*, 577 S.W.3d at 232; *In re L.M.*, 572 S.W.3d 823, 832 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Further, due to the significant collateral consequences of terminating parental rights under section 161.001(b)(1)(D) or (E), "[a]llowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d at 237. Thus, when as here a parent challenges predicate termination grounds under subsection 161.001(b)(1)

12

(D) and (E), we must address and detail our analysis under one of those subsections. *See id.* We will address the trial court's finding of endangerment under subsection (E). If we conclude that Mother's and Father's termination of parental rights is supported under that subsection, then we need not address whether termination is also supported under subsection (D) or (O). *See id.* at 232.

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* Relevant evidence in determining whether a parent engaged in a course of endangering conduct includes conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *See In re J.O.A.*, 283 S.W.3d at 345.

Child abuse necessarily endangers a child's physical or emotional well-being. *See In re A.B.M.*, No 14-21-00687-CV, 2022 WL 1311067, at *5 (Tex. App.—Houston [14th Dist.] May 3, 2022, pet. denied) (mem. op.); *In re M.H.*, No. 05-22-00017-CV, 2022 WL 3135919, at *6 (Tex. App.—Dallas Aug. 5, 2022, no pet.) (mem. op.). This court has also stated, "[i]nappropriate, abusive, or

unlawful conduct by a parent . . . who lives in the child's home can create an environment that endangers the physical and emotional well-being of a child[.]" *In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). Additionally, a parent's steadfast refusal to meaningfully limit an alleged abuser's access to the child demonstrates a pattern of conduct endangering the child's physical or emotional well-being. *See In re M.H.*, 2022 WL 3135919, at *6.

Acts of violence or abuse directed toward one child can endanger other children who are not the direct victims of the conduct and support termination of parental rights to the other children. *See In re A.C.*, 2024 WL 440263, at *8 ("the physical abuse of one child in the home supports a finding of endangerment as to the other children also present in the home, even when the other children are not the direct victims of the physical abuse in question"); *In re Baby Boy R.*, 191 S.W.3d 916, 925 (Tex. App.—Dallas 2006, pet. denied) (stating in conjunction with predicate ground (E) finding, "a parent's conduct toward a stepchild will suffice to support termination of another child, even if that conduct did not occur in the child's presence"); *see also In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.) ("a parent's endangering conduct toward other children is relevant to a determination of whether the parent engaged in behavior that endangered the child that is the subject of the suit"); *In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *1 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, pet. denied) (mem. op.) (termination premised on physical and emotional danger posed by parent convicted of aggravated assault of a different child); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (evidence as to how a parent has treated another child is relevant regarding whether a course of endangering

14

conduct has been established; evidence that a parent previously has engaged in abusive conduct allows an inference that the parent's violent behavior will continue in the future). A parent's abusive conduct toward one child can support a finding of endangerment and termination of parental rights to the other children, "even if the other children were not yet born at the time of the conduct." *In re T.L.E.*, 579 S.W.3d 616, 625 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

The evidence in this case showed two distinct acts of child abuse against Mike's sibling, Angela. The first instance was the burn on Angela's hand, which she attributed to Father putting her hand in scalding water. Although Mother and Father told similar stories that Angela burned her hand in a Mexican restaurant, neither was able to identify that restaurant, and the trial court was free to disregard their explanations as not credible. The second instance was the severe abdominal injuries suffered by Angela, which she attributed to Mother punching her repeatedly. The treating physician testified that Angela's injuries were not consistent with a fall from a chair, as suggested by Mother and Father, and that the injuries were instead attributable to child abuse. Mother and Father gave inconsistent explanations for Angela's injuries, which the Department found "deceitful." Mother and Father continued living together and did not address the abuse inflicted on Angela in individual therapy.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that Mother and Father engaged in conduct that endangered their children's physical and emotional well-being, including Mike's physical and emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). Mother and Father physically abused Angela—who was afraid of both of them—and allowed all the children to remain in the presence of the other parent, each an abuser. This is a pattern of conduct

endangering the children's emotional and physical well-being. *See In re A.C.*, 2024 WL 440263, at \*8-10; *In re M.H.*, 2022 WL 3135919, at \*6. Although this abuse occurred prior to Mike's birth, the trial court reasonably could infer from the parents' past conduct that the violent behavior and inability to protect the children from the other parent would continue in the future. *See In re T.L.E.*, 579 S.W.3d at 625; *In re A.B.M.*, 2022 WL 1311067, at \*5; *Jordan*, 325 S.W.3d at 724. Moreover, the factfinder could have reasonably believed that Mother and Father were acting in concert to conceal the fact that both of them had injured Angela, even though they agreed in the MSA that Mike remained in danger if he was not removed. Such an effort to hide their abusive conduct may constitute a steadfast refusal to meaningfully limit the other's access to their children and may demonstrate a pattern of endangering conduct. *See In re M.H.*, 2022 WL 3135919, at \*6. Thus, there is legally sufficient evidence to support the trial court's finding that termination is warranted under subsection (E). And, viewing all the evidence in a neutral light, we conclude that factually sufficient evidence supports the trial court's finding. *See In re A.C.*, 2024 WL 440263, at \*8-10.

Having concluded that the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need not review the sufficiency of the evidence to support the subsection (D) or (O) findings. We overrule Mother's and Father's second issue and do not reach their first and third issues.

## C. Best Interest

In Mother's and Father's fourth issue, they challenge the legal and factual sufficiency of the evidence to support the trial court's best-interest finding.

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. The trier of fact

16

may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (the "*Holley* factors"); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72. Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 28. And a fact finder may measure a parent's future conduct by his past conduct in determining whether termination of parental rights is in the child's best interest. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

17

We review the *Holley* factors in light of the evidence at trial. No party presented testimony regarding fourteen-month-old Mike's desires. However, Vidal testified that Mike and his sister Samantha, together in the same foster home, are bonded to each other and go on "regular outings" with the foster parents. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (when children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well cared for by the foster family, and have spent minimal time with a parent). Factor 1 weighs in favor of termination.

The foster family frequently communicates with and meets with Mike's other siblings and those siblings' foster families. Vidal testified about a recent outing with the five siblings and their foster families at a pumpkin patch. All the foster parents have a good relationship and are committed to ensuring that the siblings stay connected. Mike's foster parents have extended family who visit frequently and are able to assist in case of emergencies. Mike's foster parents plan to adopt Mike and Samantha. *Holley* factors 4 and 7 weigh in favor of termination.

The evidence showed that Mike was born healthy. The older children, save for Angela, seemed to receive adequate care from Mother and Father. However, the evidence established two instances of child abuse toward Angela, which Nicole witnessed and which caused Nicole distress. On balance, *Holley* factors 2, 3, and 8 weigh in favor of the trial court's finding.

Mother and Father have housing, and Father is employed. Both Mother and Father completed their family service plans, although they did not address Angela's abuse in their therapy sessions. Mike's maternal grandmother expressed a willingness to care for Mike, although the grandmother repeatedly expressed her

18

belief that neither Mother nor Father had abused Angela. Factors 5 and 6 are neutral.

Finally, Mother and Father gave inconsistent explanations for Angela's abdominal injuries, none of which medically explained the actual injuries. Both Detective Littler and Investigator North believed the inconsistencies indicated that one or both of the parents were lying. The fact that neither parent could name the Mexican restaurant where Angela burned her hand led Vidal to believe that they were being deceitful about the cause of that injury. In sum, the trial court reasonably could find that there is no plausible excuse for the parents' acts. *Holley* factor 9 weighs in favor of termination.

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in Mike's best interest. *See* Tex. Fam. Code § 161.001(b)(2); *see also In re A.C.*, 2024 WL 440263, at \*13 (termination of Mother's and Father's parental rights to Mike's siblings was in their best interest because Mother and Father "lack the ability to provide a safe and stable environment and successfully parent the children"); *In re A.J.F.*, No. 05-23-00134-CV, 2023 WL 4247372, at \*8 (Tex. App.—Dallas June 29, 2023, pet. denied) (mem. op.) (termination was in child's best interest when mother was aware of and indifferent toward abuse of other children); *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (termination was in child's best interest when Mother was convicted of abuse of other child). We overrule Mother's and Father's fourth issue.

19

## D.    Conservatorship

In their fifth and final issue, Mother and Father argue that the evidence is legally and factually insufficient to support the trial court's finding that appointment of the Department as sole managing conservator is in Mike's best interest.

We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable.  *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).  When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion; and (2) whether the trial court erred in its application of discretion.  *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Texas Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code § 161.207(a).  The trial court's appointment of the Department as sole managing conservator may be considered a consequence of termination.  *In re I.L.G.*, 531 S.W.3d 346, 357 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Having found the evidence sufficient to support the trial court's predicate ground and best-interest findings, we conclude the trial court had sufficient information upon which to exercise its discretion and did not abuse its discretion in appointing the Department as Mike's sole managing conservator.  *See In re L.G.R.*, 498

20

S.W.3d at 207 (finding no abuse of discretion in conservatorship finding where the evidence was sufficient to support termination of parental rights); *see also In re A.C.*, 2024 WL 440263, at \*14 (same).

We overrule Mother's and Father's fifth issue.

## Conclusion

We affirm the trial court's judgment.

/s/  Kevin Jewell
    Justice

Panel consists of Justices Jewell, Zimmerer, and Hassan.